IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JASON T. YOUNG,                    :

    Plaintiff               :     Civil Action 2:08-cv-741

v.                                 :     Judge Holschuh

COMMISSIONER OF SOCIAL             :     Magistrate Judge Abel
SECURITY,
                                   :
    Defendant

**REPORT AND RECOMMENDATION**

Plaintiff Jason T. Young brings this action under 42 U.S.C. §423 for review of a final decision of the Commissioner of Social Security denying his application for disability insurance benefits or supplemental security income. The matter is before the Magistrate Judge for a report and recommendation on the disposition of this matter.

**Summary of Issues**.

Plaintiff Jason Y. Young filed an application for disability insurance and supplemental security income benefits in 2005. He alleged that he had been disabled since August 30, 2004, at age 28, by a collapsed lung, emphysema, and irregular heartbeat. During the administrative proceedings, Plaintiff received a psychological evaluation; the psychologist found that Young had major depression.

1

The administrative law judge ("ALJ") concluded that Young had depression and a history of lung ailments as severe impairments, but that he had the residual functional capacity to perform medium work, subject to certain constraints. Plaintiff now argues that the ALJ should have found Plaintiff to have post-traumatic stress disorder as a severe impairment, and that the ALJ improperly relied upon the testimony of a vocational expert who was responding to inaccurate hypothetical questions that did not include all his psychiatric limitations.[1]

**Procedural History**. Plaintiff Young filed his application for disability insurance benefits on February 18, 2005, alleging disability as of August 30, 2004. (R. 63-65.) He also filed, on the same date, an application for supplemental security income benefits. (R. 265-268.) His applications were denied initially and on reconsideration. A hearing on his applications was held before an administrative law judge on August 7, 2007, at which a vocational expert testified. On January 28, 2008, the ALJ issued an unfavorable decision finding that Young was not disabled because he could perform his past relevant work. (R. 11-25.) Plaintiff now seeks review of this decision.

<u>**Age, Education, and Work Experience**</u>. Plaintiff Jason Young was born on

---

[1] Plaintiff does not object to the ALJ's determinations concerning the severity of his pneumothorax and hemothorax history. This report and recommendation will therefore not address the record as to Plaintiff's physical impairments.

2

August 9, 1976, and claims that he became disabled on August 30, 2004, at the age of 28. (R. 63.) He obtained his GED in 1999. (R. 83.) He has in the past worked as a floor waxer, assistant cook, security guard, and fast food shift manager. (R. 114.)

**Plaintiff's Testimony**. The administrative law judge fairly summarized Young's testimony at the hearing as follows:

> The claimant alleged that he is disabled due to depression and lung problems. He has had depression for several years, but it was first brought to his attention in an argument with another person, who suggested to him that he see someone about this problem. This was over a year ago and his treatment at Clark County Mental Health is the first time he saw someone for depression. He sees Dr. Chan approximately once per month for treatment and a therapist once every other week. His counselor gives him techniques to utilize when under a stressful situation. It helps him to have someone to talk to about what is going on in his head. His counselor says that most of his problems are due to post-traumatic stress disorder. He has been shot at and also saw a 17-year-old shot to death in the period from 1999 through 2000. He also reported that he was getting death threats from a neighbor at that time. His depression makes him feel worthless. He gets down and is not able to get along with others. The medication helps his stress, but does not really help his depression.
>
> He also stated that he cannot "breathe right." His lungs collapsed in 2000 and 2002. Every day he has chest pains due to this problem. The pain feels like he is getting a needle stuck in his chest, but it varies in severity. He takes no medication for this problem. He has an inhaler, but this is only for shortness of breath. He has no medical insurance, but his family doctor prescribes his medication.
>
> He may vacuum the front room, but his mother does all other household chores. He stays in the front room because it is air conditioned and does not help his mother with any chores. He stated that if he does too much, he will need to take breaks and use his inhaler a lot, so he does not stress himself by helping his mother. He does not have friends and does not socialize with others. He still smokes marijuana about every other week if he gets stressed out. He

3

smokes approximately two to four packs of cigarettes per day. He
spends a typical day taking care of his dogs and watching television.
He watches television until 4 or 5 in the morning. He stated that he
cannot walk more than a block before resting approximately 10
minutes. Standing and sitting are not restricted. He stated that he
was not supposed to lift more than 20 or 25 pounds. He has no
environmental factors that aggravate his physical condition, but on
cross-examination stated that he has trouble breathing around
chemicals or even fumes from mustard.

(R. 15.)

### Medical Evidence of Record.

Although the administrative law judge's decision fairly sets forth the relevant medical evidence of record, this Report and Recommendation will summarize that evidence in some detail.

### Mental Impairments.

William D. Padamadan, M.D. Dr. Padamadan performed a physical examination of Plaintiff on April 25, 2005 as part of a state agency disability review. In his report, he stated that Plaintiff's "mental status was normal without any overt signs of anxiety or depression." (R. 203.)

David Gorrell, Ph.D. On August 29, 2006, Plaintiff visited Dr. Gorrell for a psychosocial assessment. Plaintiff told Dr. Gorrell that he was obtaining medical help because he had, for the last two years, felt tired and sluggish all the time. (R. 220.) He said that he needed help with stress, and that he took it out on others. Plaintiff further stated that he "can get violent if pushed". Dr. Gorrell noted that

4

Plaintiff had a blunted affect and dysphoric mood, and that his insight and judgment were fair. His thought processes were grounded. (R. 222.) He reported no hallucinations or suicidal ideations. Dr. Gorrell concluded that Plaintiff had major depression, and that his GAF score was 55. He referred Young for a psychopharmacological evaluation. (R. 222.)

On September 19, 2006, Plaintiff saw Dr. Gorrell again. He reported vomiting and lack of appetite for the past four days, although he did not know the reason. (R. 214.) He also claimed to be having violent dreams, and to awaken in sweats; one morning, he awakened to find BB holes in his window and walls. Dr. Gorrell observed: "Client appears to be making a case. Brought papers for SSD." (R. 214.) He prepared a form mental capacity evaluation, which stated that Plaintiff had, in Dr. Gorrell's opinion, "unlimited/very good" ability to maintain regular attendance and punctuality, and "good" ability to respond appropriately to changes in routine setting, function independently without special supervision, understand, remember, and carry out simple job instructions, maintain his personal appearance, manage funds or schedules, and leave home on his own. However, he had "poor or none" ability in fourteen other occupational areas. (R. 211-212.)

Kayleen Klier, PCC. On October 31, 2006, Plaintiff was transferred to a new therapist. Ms. Klier discussed Plaintiff's mental health concerns, such as depression, anxiety, agoraphobic behavior, and his unemployment- and health-related problems. She concluded that he had an optimistic mood and an

5

unremarkable affect. (R. 243.) On November 30, 2006, Plaintiff visited Ms. Klier again. She stated that he "indicated information that led to reassessment of present level of functioning", and diagnosed him with post-traumatic stress disorder ("PTSD"). She gave him literature about PTSD, and found that he had a nervous, anxious mood and a constricted affect. (R. 243.)

Plaintiff consulted Ms. Klier several times over the course of the next year:

● January 2, 2007: Plaintiff reported continued problems with nightmares, anxiety, and irritability. Klier noted nervous, anxious mood and constricted affect. (R. 240.)

● January 17, 2007: Plaintiff showed improvement in mood over past weeks due to having more things to occupy himself. His mood was positive and optimistic; his affect was congruent. (R. 239.)

● January 30, 2007: Plaintiff discussed with Ms. Klier some elements contributing to his anxieties, such as impending eviction. His mood was nervous and anxious; his affect was unremarkable. (R. 239.)

● February 27, 2007: Plaintiff stated that his level of anxiety had remained the same, but that his level of stress was increasing due to his possible impending eviction. His mood was anxious, depressed, and frustrated; his affect was strained. (R. 236.)

● March 13, 2007: Ms. Klier evaluated Plaintiff for warning signs of PTSD. Plaintiff claimed the signs of sweaty palms and shaking feet. He also stated that he suffered from nightmares and sleepwalking. Ms. Klier referred him to Dr. Smith

6

for medication evaluation, and noted his mood as anxious and nervous, and his affect as distracted. (R. 236.)

- March 27, 2007: Plaintiff reported poor sleeping, sleepwalking, and feeling stressed out and irritable. Ms. Klier suggested that he speak to Dr. Smith about sleep assistance and that he try to expand his limits of comfort. His mood was cheerful and positive, with congruent affect. (R. 236.)

- April 10, 2007: Plaintiff reported that he experienced periods of two to three days' improved mood, and then depression and anxiety. He experienced episodes of sleepwalking and sleepsmoking. His mood was cheerful but slightly anxious. (R. 235.)

- April 24, 2007. Plaintiff reported that his cycles of improved mood and depression were continuing, but that his depression and irritation were not as severe as before. Ms. Klier noted that he had expressed an interest in working with computers. His mood was positive, and his affect unremarkable. (R. 235.)

- May 22, 2007. Ms. Klier noted that she was assisting Plaintiff with completing an application for disability benefits. Plaintiff reported continuing cycles of three good days and two bad. He stated that he had forgiven himself for any guilt over the shooting incident he had witnessed. His mood was nervous, and his affect was strained. (R. 233.)

Ms. Klier's assistance apparently took the form of a May 22, 2007 letter addressed "To Whom It May Concern":

This letter is regarding Ms. Jason Young and his treatment at Mental

7

> Health Services for Clark and Madison Counties. Mr. Young has diagnoses of: 311 Depressive Disorder NOS; 314.01 ADHD, predominantly hyperactive type; 309.81 PTSD. His depression is severe enough that he has difficulty getting up; feels hopeless and helpless. Depression & ADHD also contributes to difficulty concentrating and maintaining his attention which would be non-productive in the work environment. His symptoms of anxiety and nervousness greatly affect his ability to go out in public, interact appropriately with people, and lead to hypervigilance. These symptoms would be greatly aggravated should he be placed in a normal work environment and expected to manage daily stressors.

(R. 225.)

• June 5, 2007. Ms. Klier stated that Plaintiff had shared with her "new symptoms" and concerns. His mood was worried and slightly anxious, and his affect was uncomfortable. (R. 233.)

• June 17, 2007. Ms. Klier discussed with Plaintiff controlling his negative thoughts, and encouraged him to go outside to become more familiar with his surroundings. His mood was worried, and his affect was blunted. (R. 233.)

• July 7, 2007. Plaintiff discussed with Ms. Klier how to manage his irritation and negative thinking; she encouraged him not to become involved in others' business. Ms. Klier gave him suggestions for managing sleep problems and hypervigilance. (R. 230.)

• July 17, 2007. Ms. Klier noted that she discussed with Plaintiff how to manage situations, and techniques for anger management. His mood was frustrated, and his affect unremarkable. Ms. Klier noted that she was considering closing the case in a couple of months. (R. 230.)

Yiu-Chuay Chan, M.D.  Plaintiff repeatedly saw Dr. Chan for mental status exams.[2]

• January 17, 2007.  Dr. Chan observed that Plaintiff was oriented, had normal speech and coherent thought processes, good judgment and insight, and no delusions or hallucinations.  Plaintiff had a depressed mood and impaired concentration.  Dr. Chan diagnosed Plaintiff with PTSD as a result of witnessing the murder, and recommended counseling.  (R. 237.)

• April 18, 2007.  Dr. Chan reported some improvement, but that Plaintiff continued to suffer from nightmares and sleepwalking.  His mental status was apparently improved from his prior examination, with a euthymic mood and improving concentration.  (R. 234.)

• June 6, 2007.  Plaintiff reported that his anxiety was improved by medication, though his appetite was decreased.  His memory was intact, his thought processes coherent, and he was oriented.  However, he had a constricted affect, and his mood was angry and anxious.  Dr. Chan noted limited insight and judgment.  He again diagnosed Plaintiff with PTSD.  (R. 232.)

• July 6, 2007.  Dr. Chan performed a mental status exam, which was completely unremarkable.  Plaintiff reported that his sleep continued to be erratic, and his appetite was still low.  (R. 231.)

---

[2] Dr. Chan's notes are generally difficult to read.

Dr. Chan and Ms. Klier co-signed a May 22, 2007 form mental capacity evaluation, similar to that completed by Dr. Gorrell on September 19, 2006. They rated Plaintiff as having an "unlimited/very good" ability to follow work rules, a "good" ability to use judgment, a "fair" ability to function independently without special supervision, to maintain his appearance, and understand, remember, and carry out simple job instructions. They rated his ability as "poor or none" in sixteen other occupational areas, including the abilities to maintain attention and concentration for extended periods, to complete a normal workday and work week, and to deal with job-related stress. (R. 223-224.)

Administrative Law Judge's Findings.

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity since August 30, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571, *et seq*, 416.920(b), and 416.971, *et seq*).

3. The claimant has the following severe impairments: depression and a history of hemothorax and pneumothorax (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work except that he is limited to occasional to minimal contact with co-workers and supervisors and must work in a job that permits working alone, but not in total isolation; should not have contact with

> the generally [sic] public as a work requirement; should work in a fairly static and routine work setting with no production quotas or fast pace work activity.
>
> 6. The claimant is capable of performing past relevant work as floor waxer. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).
>
> 7. The claimant has not been under a disability, as defined in the Social Security Act, from August 30, 2004 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

**Standard of Review**. Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. ..." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)). It means "'more than a scintilla.'" *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments**.  Plaintiff raised the following objections to the Commissioner's findings:

1. The ALJ erred in relying on the testimony of the vocational expert to find that Plaintiff could return to his past job as a floor waxer, as the judge's hypothetical question to the expert did not include all of the plaintiff's psychological restrictions.

2. The ALJ erred by not finding that Plaintiff suffered from an additional severe impairment, namely post-traumatic stress disorder, because the medical evidence established that Plaintiff had that impairment and that it was severe in nature.

**Analysis**.

Plaintiff argues in the first place that the ALJ posed a hypothetical question to the testifying vocational expert which did not accurately represent Plaintiff's psychological restrictions, and that the ALJ thereupon erroneously relied upon the testimony he received in response.  At the hearing, Plaintiff testified that he had been previously employed as a floor waxer.  (R. 286.)  The administrative law judge asked the testifying vocational expert the following question:

> Q. If I would give you a medium RFC, but I would say that he would have minimal contact with coworkers and supervisors, and I'd say no contact with the general public, and the job that he could do could be primarily done alone but not in isolation, how would that affect his past relevant work?
>
> A. Your Honor, I would think that the only job that I believe, based on my understanding and observation would be the floor waxer that could be done, the rest of it would be precluded.

(R. 288.)  In his written opinion, the ALJ thereupon concluded that Plaintiff was capable of performing past relevant work as a floor waxer.  (R. 24.)

12

Plaintiff points out that the ALJ's fifth finding, relating to residual functional capacity, includes the proviso that Plaintiff "should work in a fairly static and routine work setting with no production quotas or fast pace work activity." (R. 21.) He argues that the omission of this clause in the ALJ's hypothetical question to the vocational expert yielded a response upon which the ALJ could not fairly base a conclusion. "We simply don't know if the floor waxer job may involve working at a fast pace, absent vocational testimony or other evidence that it does not involve that sort of job-related stress." (Doc. 15 at 9.)

This objection is unreasonable. As the defendant points out, the vocational expert was asked, at the hearing, several different hypothetical questions. In one of these, Plaintiff's counsel asked the expert what jobs would be available if the expert assumed that Plaintiff would have to perform light, unskilled work, with the mental and nonexertional limitations which the ALJ had already indicated, no high production quotas, and environmental restrictions to accommodate his breathing problems. The expert concluded that about 8,000 to 10,000 jobs were available, including mail clerk, photocopying machine operator, and garment sorter. (R. 292-293.) Even if, arguably, the ALJ's hypothetical question about past relevant work were flawed, and the ALJ's conclusion that Plaintiff could perform past relevant work as floor waxer were thus unfounded, the ALJ could nevertheless have concluded that Plaintiff could, with his vocational restrictions, perform other work. The phrasing or misphrasing of the first hypothetical question was harmless error.

Plaintiff also argues that the ALJ erred in not finding that he suffered from

an additional impairment, post-traumatic stress disorder, because the medical evidence demonstrated that he had PTSD and that it was severe. This argument is generally founded in the ALJ's classification of Plaintiff's severe mental impairment as depression. By doing this, Plaintiff argues, the ALJ failed to address his real mental impairment, which Dr. Chan and Ms. Klier had diagnosed as PTSD. Plaintiff claims that the ALJ was not justified in rejecting the findings of Dr. Gorrell and Ms. Klier as to depression, where they should properly have been regarded in the context of the anxiety disorder of PTSD.

The ALJ did not make specific reference to PTSD in his opinion. Plaintiff, at his hearing, referred to both depression and PTSD:

> Q. Okay, now if I were to ask you what is the major medical reason, the medical impairment that has prevented you from working since 2004, what would you say it is?
>
> A. I would probably have to say depression and the, the lungs, I just can't, you know, I don't breathe right.
> [...]
>
> Q. Well, do you know what, have you found out what causes your depression?
>
> A. Most of it's due to post traumatic stress, according to Kayline [Klier].

(R. 266-267.)

The administrative law judge found that Plaintiff's depression was a severe impairment. However, although he found that Plaintiff had mild or moderate difficulties in some areas, he rejected the assessments of Dr. Gorrell and Ms. Klier which stated that Plaintiff had significant impairments. The ALJ stated that his

14

review of their treatment notes did not support their conclusions, because they reflected only supportive counseling, not the more intensive therapy which would be appropriate for so substantial a degree of impairment. (R. 20.) He also identified Dr. Gorrell's notation that Plaintiff appeared to be making a case for benefits, and that the assessments of Dr. Gorrell and Ms. Klier did not match the generally normal mental status which Dr. Chan found. (R. 20.)

Plaintiff does not identify any particular omission in the ALJ's opinion resulting from his failure to specifically identify PTSD as a severe impairment. He found that Plaintiff had depression, and that it was severe within the meaning of the Social Security Act. (R. 17.) Moreover, the ALJ extensively addressed Plaintiff's mental condition, including anxiety (R. 19), nightmares (R. 19), stress (R. 20), and feelings of nervousness around others (R. 23.) The ALJ's decision not to give credence to the assessments of Dr. Gorrell and Ms. Klier was founded in inconsistencies between their extremely pessimistic assessments and the medical evidence contained in their notes and in Dr. Chan's mental status evaluations. In addition, the ALJ found that Plaintiff's own behavior did not appear consistent with the mental symptoms he claimed. (R. 23.)

It is not clear how, if the ALJ had cast his analysis in terms of PTSD rather than depression, these facts might have led the ALJ to a different conclusion with respect to the severity of Plaintiff's mental condition and the limitations resulting from his mental illness. Plaintiff argues that "since the main impairment Plaintiff suffers from, psychologically, is PTSD, the ALJ's analysis is necessarily faulty."

15

(Doc. 15 at 11.) The essence of the ALJ's analysis – that the assessments of Dr. Gorrell and Ms. Klier that Plaintiff's condition gave him "poor or none" ability to function in most vocational areas did not match their own records – would not have been different if the ALJ had described Plaintiff's severe condition as PTSD instead of depression. This argument is not well taken.

Therefore, the Court finds that the decision of the Commissioner was based on substantial evidence. I accordingly **RECOMMEND** that the Commissioner's decision be **SUSTAINED**, and that this matter furthermore be **DISMISSED**.

If any party objects to this Report and Recommendation, that party may, within ten (10) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the party thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgement of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also, Small v. Secretary of Health and Human Services*, 892 F.3d 15, 16 (2d Cir. 1989).

s/Mark R. Abel
United States Magistrate Judge